**In re THERAGENICS CORP.
SECURITIES LITIGATION.**

**Civil Action No. 1:99–CV–141–TWT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 26, 2002.

Martin D. Chitwood, Chitwood & Harley, Altanta, GA, Steven G. Schulman, Salvatore J. Graziano, Samuel H. Rudman, Keith M. Fleishman, Milberg Weiss Bershad Hynes & Lerach, New York City, Jeffrey R. Krinski, Finkelstein & Krinsk, San Diego, CA, Leonard Barrack, M. Richard Komins, Barrack Rodos & Bacine, Philadelphia, PA, Zachary Alan Starr, Starr & Holman, New York City, Fred Taylor Isquith, Shane T. Rowley, Wolf Haldenstein Adler, New York City, Robert I. Harwood, Jeffrey M. Haber, Frederick W. Gerkens, Wechsler Harwood Halebian & Feffer, New York City, Marc H. Edelson, Hoffman & Edelson, Doylestown, PA, Joshua N. Rubin, Abbey Gardy, New York City, Jonathan M. Plasse, Goodkind Labaton Rudoff & Sucharow, New York City, Jeffrey L. Kodroff, Spector Roseman & Kodroff, Philadelphia, PA, Dennis J. Johnson, Jacob B. Perkinson, Law Offices of Dennis J. Johnson, South Burlington, VT, Kevin J. Yourman, Jordan L. Lurie, Weiss & Yourman, Los Angeles, CA, Michael D. Braun, Stull Stull & Brody, Los Angeles, CA, Jacqueline Sailer, Brian P. Murray, Rabin & Peckel, New York City, for MCV Sales Inc. Profit Sharing Plan and Trust DTD, Peter Corey, Robert Hudson, James J. Holten, W. H. Thead, Jr., Herbert Garbutt, Danie Kursman, Robert L. Thomas, Jr., Sidney Fielden, Bruce B. Bernstein, Gerladine Byers, Howard B. Marks, Alexander T. Kowalski, Sara Cheeseman, Jerry L. Jensen and Joseph S. Butler.

Michael R. Smith, Martin Robert Thornton, Letitia A. McDonald, Dan Shamus McDevitt, John Patterson Brumbaugh, King & Spalding, Atlanta, GA, for Theregenics Corp., M. Christine Jacobs, Bruce W. Smith.

## ORDER

THRASH, District Judge.

This is a complex private securities fraud class action brought on behalf of shareholders of Theragenics Corporation. It is before the Court on Plaintiffs' Motion for Class Certification [Doc. 41]. For the reasons set forth below the Court grants Plaintiffs' Motion.

### I. BACKGROUND

Plaintiffs are members of a potential class of purchasers of Theragenics Corporation common stock during the period January 29, 1998, to January 11, 1999. Defendant Theragenics Corporation is a Delaware corporation with its principal place of business in Norcross, Georgia. It is engaged in the business of producing and selling radioactive seed implants to treat cancer. Defendant Christine Jacobs is President, Chief Executive Officer and Chairperson of Theragenics. Defendant Bruce Smith serves as Chief Financial Officer, Treasurer and Secretary of the company. Both individuals held their respective positions at all times material to the claims Plaintiffs set forth in their Second Amended Complaint.

Theragenics manufactures Palladium–103, also known as TheraSeed®. A competitor, Nycomed Amersham PLC (formerly Amersham International PLC) [hereinafter "Amersham"], is the primary supplier of Iodine–125, a similar product used to treat prostate cancer.[1] For both products, medical professionals implant into the prostate between 40 and 100 rice-size radioactive seeds that emit radiation to destroy prostate cancer tumors. Iodine–125 seed implants began to be used to treat prostate cancer in the 1970's, but this treatment of prostate cancer was largely abandoned because of unsatisfactory results. By the late 1980's, however, new technology led to a resurgence in Iodine–125 seed treatment for prostate cancer. Thereafter, Theragenics entered the field with its own Palladium–103 TheraSeed®, which it previously had developed to treat other types of tumors. Theragenics' success in the field of prostate cancer treatment was tempered by the fact that TheraSeed®'s short half-life makes it less efficacious than Iodine–125 for treating slow-growing prostate cancer. For this reason, according to the Amended Complaint, Iodine–125 has remained the preferred radioactive seed to treat prostate cancer.

In May, 1997, in an attempt to bolster its earnings, Theragenics granted Indigo Medical, Inc., a subsidiary of Johnson & Johnson Development Corporation, the exclusive worldwide right to market and sell TheraSeed®. This agreement with Indigo purportedly enabled Theragenics to focus on manufacturing instead of developing and maintaining its own sales force. By 1998, substantially all of Theragenics' sales occurred through Indigo. In early 1998, competitor Amersham began to encounter severe manufacturing shortages of Iodine–125. The waiting period for doctors who requested Iodine–125 increased from one month near the end of 1997 to more than four months by January 1998. This backlog became so great that in March 1998 Amersham notified its customers that it could not accept any new orders for Iodine–125 until further notice. As a result of this Iodine–125 shortage, doctors substituted TheraSeed® in their implant procedures and Theragenics revenues consequently increased. Theragenics became concerned that this increased demand—when coupled with Indigo's aggressive marketing efforts—could result in shortages of TheraSeed®, thus placing the company in the same position as Amersham. For that reason, Theragenics asked Indigo to temporarily reduce its TheraSeed® marketing efforts.

During the period that TheraSeed® enjoyed strong sales (allegedly because of Amersham's Iodine–125 shortage) Theragenics, in its public statements, said that doctors and patients increasingly considered TheraSeed® the prostate cancer treatment of choice, and that Indigo's marketing efforts were contributing to the acceleration in sales. Theragenics did not include cautionary statements that the increased sales were the temporary result of Amersham's Iodine–125 shortage, nor did it notify investors that it had asked Indigo to curb its sales efforts.

By August, 1998, Amersham had remedied the Iodine–125 shortage and doctors thereafter returned to Iodine–125 as their preferred radioactive seed for treating prostate cancer. As a result, Theragenics' fourth quarter 1998 earnings were below its earnings in previous quarters. In announcing its disappointing fourth quarter results in January, 1999, Theragenics did not disclose to investors that its decreased earnings resulted in any way from the renewed availability of Amersham's Iodine–125 seeds or that it had directed Indigo to curb sales efforts. Instead, Theragenics blamed the earnings decrease on Indigo's inexperience in marketing the product. Theragenics' share price dropped 33.8% in one day, from $15.3125 to $10.125.

Plaintiffs have filed this suit alleging that Defendants knew or recklessly disregarded knowledge that the increase in Theragenics revenues in the first three quarters of 1998 resulted directly from Iodine–125 shortages, and that revenues would decline once Iodine–125 became readily available again. Furthermore, Plaintiffs allege that Defendants falsely attributed the early 1998 increase in

---

1. At this stage of the action, the Court must accept as true the facts alleged in the Amended Complaint.

revenues to both increased acceptance of TheraSeed® and Indigo's marketing efforts, which Theragenics actually had curtailed. Specifically, Plaintiffs have identified ten statements[2] that they contend were false or misleading:

(1) A January, 1998, statement that new cyclotrons would "supply anticipated increases in TheraSeed® demand generated by ... Indigo Medical" and that "[t]he acceptance of the Company's non-invasive treatment for prostate cancer by the public and the medical community has been outstanding." (Plaintiffs' Second Amended Complaint, at ¶ 34.) [Doc. 24]

(2) A February, 1998, statement that "[i]n urology and prostate cancer treatment, there has never been a presence with a marketing prowess like Johnson & Johnson." (Plaintiffs' Second Amended Complaint, at ¶ 35.) [Doc. 24]

(3) A statement in Theragenics' 1997 10–K that management "believe[d]" that TheraSeed® enjoyed a competitive advantage over Iodine–125 seeds. (Plaintiffs' Second Amended Complaint, at ¶ 36.) [Doc. 24]

(4) An April, 1998, Company press release announcing record first quarter revenues and earnings and stating: "[a]cceptance of TheraSeed® as a treatment of choice for prostate cancer by both doctors and patients continues to escalate." (Plaintiffs' Second Amended Complaint, at ¶ 37.) [Doc. 24]

(5) A statement in Theragenics' 10–Q for the first quarter of 1998 that: "Marketing efforts along with increased awareness of prostate cancer treatment options have contributed to the continued sales acceleration." (Plaintiffs' Second Amended Complaint, at ¶ 38.) [Doc. 24]

(6) A June, 1998, Company press release that stated: "Receiving our CE Mark and shipping our first order to Europe is another step forward in the evolution of Theragenics. This is just one example of why the Company's agreement with Indigo is so powerful." (Plaintiffs' Second Amended Complaint, at ¶ 39.) [Doc. 24]

(7) A July, 1998, Company press release announcing record second quarter revenues and stating that the Company's expanded manufacturing capacity would allow it to "meet the continued demand for TheraSeed®." (Plaintiffs' Second Amended Complaint, at ¶ 41.) [Doc. 24]

(8) A statement from Theragenics' 10–Q for the second quarter of 1998 that the Company's increased revenues were attributable to increased production volume and "increased patient awareness of TheraSeed® procedure." (Plaintiffs' Second Amended Complaint, at ¶ 42.) [Doc. 24]

(9) An October, 1998, Company press release announcing record revenues for the third quarter of 1998 and stating that the Company's increased manufacturing capacity would "allow [Theragenics] to offer more cancer patients the opportunity to take advantage of the TheraSeed® treatment." (Plaintiffs' Second Amended Complaint, at ¶ 43.) [Doc. 24]

(10) The Company's January 11, 1999, press release regarding its disappointing fourth quarter 1998 earnings and a conference call Defendants Jacobs and Smith held later that day with securities analysts. In both the press release and the conference call, Theragenics blamed the disappointing earnings on misallocation of resources by Indigo and stated that Indigo was adjusting its marketing and sales focus. (Plaintiffs' Second Amended Complaint, at ¶¶ 45, 46.) [Doc. 24]

According to Plaintiffs, these allegedly false statements and omissions inflated the value of Theragenics stock in violation of the Securities Exchange Act of 1934 and injured Plaintiffs as purchasers of Theragenics stock at the artificially inflated prices. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Plaintiffs seek an order certifying this action as a class action with respect to the following class:

All persons who purchased the common stock of Theragenics Corporation ("Theragenics" or the "Company") between Janu-

---

2. Defendants contend that there are only nine statements. (Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, at 6 n. 3.)

[Doc. 28] The Court, however, includes as the tenth statement the January 11, 1999, press release and conference call.

ary 29, 1998 and 11, 1999, inclusive and who were damaged by it. Excluded from the Class are [D]efendants, the officers and directors of Theragenics at all relevant times, members of the immediate families and the legal representatives, heirs, successors or assigns of [D]efendants and the officers and directors of the Company and any entity in which [D]efendants have or had a controlling interest.

(Plaintiffs' Motion for Class Certification, at p. 1) [Doc. 41]. During the Class Period, Theragenics reported that it had at least 29,178,132 shares of its stock outstanding. (Plaintiffs' Second Amended Complaint, at ¶ 54) [Doc. 24]. Further, the trading volume of Theragenics common stock on January 11, 1999, the day that the company revealed that its fourth quarter earnings would be flat was more than 3,410,000 shares. The exact number of potential class members is not known to Plaintiffs at this time, but it is estimated to be several thousand. The Plaintiffs claim to be similarly situated with the class they propose to represent in that they claim they have purchased Theragenics stock as a result of misrepresentations made by the Defendants in the company's public filings, public statements and press releases. In their Motion for Class Certification [Doc. 41], the Plaintiffs contend that the proposed class in this securities fraud case satisfies both the requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy) and Rule 23(b)(3) (predominance and superiority). Defendants oppose Plaintiffs' motion for class certification only on a single ground. Defendants assert that Herbert Garbutt, Robert Thomas, Melvin Van Dyke and Peter Corey will not fairly and adequately protect the interests of the proposed class.

## II. DISCUSSION

### A. CLASS CERTIFICATION UNDER RULE 23

To maintain this case as a class action, the Plaintiffs must satisfy the four prerequisites of Rule 23(a) and at least one of the provisions of Rule 23(b). See In re Miller Industries, Inc. Securities Litigation, 186 F.R.D. 680, 683 (N.D.Ga.1999); In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 683 (N.D.Ga.1991). Rule 23(a) sets forth the four prerequisites to maintain any claim as a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Under Rule 23(b), the Plaintiffs must also convince the Court that:

> [T]he questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

The party seeking class certification bears the burden of proof. *Heaven v. Trust Co. Bank*, 118 F.3d 735, 737 (11th Cir.1997). The courts have generally followed a policy of liberal construction of Rule 23 in the context of federal securities fraud actions. *See Kennedy v. Tallant*, 710 F.2d 711, 717–18 (11th Cir.1983); *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.), *cert. denied sub nom., Wasserstrom v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). In a doubtful case, it is better to allow the case to proceed as a class action. *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969). The Eleventh Circuit has explicitly recognized that securi-

ties class actions serve both the public interest in maintaining the integrity of the securities markets and the private interests of investors who would not otherwise obtain redress of grievances through a multiplicity of small individual damage suits. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir.1987), *cert. denied sub nom, Robinson Humphrey/American Express v. Sanders*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988).

 The Court must accept the allegations in the Amended Complaint as being true in considering class certification. When considering a motion for class certification, the court does not inquire whether the plaintiffs have adduced sufficient evidence to prevail on the merits of their claims. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir.1996), *cert. denied*, 519 U.S. 1149, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997); *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). Nevertheless, the court must perform a "rigorous analysis" of the arguments asserted in support of class certification. *Gilchrist v. Bolger*, 733 F.2d 1551, 1556 (11th Cir.1984). The court is not limited to the substance of the parties' pleadings and should allow them to conduct limited discovery and adduce evidence relevant to the class certification issue. *See Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570–71 (11th Cir.1992). With regard to the need for discovery, the Supreme Court has stated:

> [T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

*General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (citations omitted). The decision to grant or deny class certification lies within the sound discretion of the district court. *Giles v. Ireland*, 742 F.2d 1366, 1372 (11th Cir.1984).

## B. RULE 23(A) ANALYSIS

The four prerequisites of Rule 23(a) are commonly referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. The Defendants have made specific objections to adequacy of representation. Because absent class members are bound by a decision on the merits after class certification, in addition to addressing this objection, the Court will briefly address the other three requirements of Rule 23(a).

### 1. NUMEROSITY

 The numerosity requirement is satisfied if the proposed class is so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). "Impracticable" is not synonymous with "impossible," and the Plaintiffs "need only show that it would be extremely difficult or inconvenient to join all members of the class." *Miller Industries*, 186 F.R.D. at 685; *Domestic Air*, 137 F.R.D. at 698. Numerosity is generally presumed when a claim involves nationally traded securities. *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir.1981). The Court finds that joinder of potentially thousands of Theragenics shareholders during the Class Period would be highly impractical if not impossible. Thus, the Plaintiffs have satisfied the numerosity requirement.

### 2. COMMONALITY

 To satisfy the commonality requirement, the Plaintiffs must show the presence of questions of law or fact common to the entire class. Fed.R.Civ.P. 23(a)(2). It is not necessary that all questions of law and fact be common. *Cox*, 784 F.2d at 1557; *Miller Industries*, 186 F.R.D. at 685. Nevertheless, "commonality will not exist as long as there is a predominance of individual issues." *Domestic Air*, 137 F.R.D. at 699. The question of commonality in Rule 23(a)(2) overlaps significantly with the predominance requirement contained in Rule 23(b)(3).

■ In this case, there are common questions of law and fact including (1) whether Defendants or any of them violated §§ 10(b) or 20(a) of the Securities Exchange Act of 1934; (2) whether Theragenics' publicly disseminated documents omitted or materially misrepresented material facts concerning its business and business prospects; (3) whether the market price of Theragenics common stock during the Class Period was artificially inflated due to the alleged material nondisclosures and/or misrepresentations; and (4) whether members of the proposed Class have suffered damages as a result. The commonality issue of Rule 23(a)(2) and the predominance issue of Rule 23(b)(3) overlap. The Court finds that the Plaintiffs have satisfied the minimal showing required to establish commonality.

## 3. TYPICALITY

■ The typicality requirement is satisfied if the claims and defenses of the representative plaintiffs are typical of the claims and defenses of the class. Fed.R.Civ.P. 23(a)(3). This requirement is satisfied when "a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff." *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1022 (11th Cir.1996); *Miller Industries*, 186 F.R.D. at 685. The same factors that satisfy the commonality requirement also may satisfy the typicality requirement. *See Cox*, 784 F.2d at 1557. The standard for judging typicality is set forth in *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332 (11th Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985), where the court held:

> A class representative's claims or defenses must be typical of the claims or defenses of the class. In other words, there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class. A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not ren-

der a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class.

*Id.*, 741 F.2d at 1337 (citation omitted).

■ In the instant case, the claims asserted by the Proposed Class Representatives arise from the same events and practices and are based on the same legal theories as the claims of absent Class members. Each Class member and Proposed Class Representative alleges that Defendants violated Section 10(b) of the Exchange Act by publicly disseminating a series of false and misleading statements, and that Class members purchased Theragenics stock at prices inflated by Defendants' misrepresentations and were damaged thereby. Thus, the Proposed Class Representatives' claims are typical of members of the Class whom they seek to represent.

## 4. ADEQUATE REPRESENTATION

■ To satisfy the adequacy of representation requirement, the Plaintiffs must show that they, as class representatives, will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). The adequacy inquiry under Fed.R.Civ.P. 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689(1997). To ensure that a representative will adequately represent the class the plaintiff must satisfy two tests. First, there must be no substantial conflict of interest between the representative and the class. *Sosna v. Iowa*, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Miller Industries*, 186 F.R.D. at 686. If the conflict of interest pertains to the specific issues being litigated, class certification is inappropriate. *Warren v. City of Tampa*, 693 F.Supp. 1051, 1061 (M.D.Fla.1988), *aff'd* 893 F.2d 347 (11th Cir.1989). "Antagonistic interests are not only those which directly oppose one another, but also are those which may be hostile to one another or unharmonious such that one party's interest may be sacrificed for anoth-

er's." *Telecomm Technical Services, Inc. v. Siemens Rolm Communications, Inc.*, 172 F.R.D. 532, 544 (N.D.Ga.1997). Second, there must be evidence that the representative will adequately pursue prosecution of the lawsuit. *Sosna*, 419 U.S. at 403, 95 S.Ct. 553; *Miller Industries*, 186 F.R.D. at 686.

The Defendants contend that the lead Plaintiffs have not demonstrated that they will vigorously prosecute their claims or supervise class counsel. The Defendants argue that the lead Plaintiffs are inadequate class representatives because they are unfamiliar with the allegations of the Amended Complaint and are unfamiliar with, unwilling to or unable to discharge their obligations as class representatives. No useful purpose would be served in addressing the Defendants' arguments as to each of the proposed class representatives. The basic flaw of the Defendants' analysis is that the alleged deficiencies of the proposed class representative are irrelevant in a fraud on the market case such as this which is prosecuted by able and experienced counsel.

Defendants contend that this Court should follow the Fifth Circuit decision in *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir.2001), rehearing denied, 279 F.3d 313 (5th Cir.2002), which Defendants argue has raised the adequacy standard of Fed.R.Civ.P. 23 in private securities class actions. In *Berger*, the Fifth Circuit held that the Private Securities Litigation Reform Act ("Reform Act") raised the standard of adequacy threshold for lead plaintiffs in a securities class action. *Berger*, 257 F.3d at 483. The court stated that in order to be an adequate representative in a securities fraud lawsuit, the Reform Act required that "[p]laintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel." *Berger*, 257 F.3d at 483, n. 18. In ruling on the plaintiffs' motion for rehearing, the court backed away from this position and stated that the result in that case was based upon prior circuit precedent rather than the Reform Act. *Berger*, 279 F.3d at 313–14. This Court is not persuaded that it should follow the original opinion in *Berger*. To do so would require

the Court to ignore controlling Eleventh Circuit authority.

The legal standard for adequacy of class representation is well established in the Eleventh Circuit. The standard involves inquiry into questions of whether Plaintiffs' counsel are qualified, experienced and generally able to conduct the litigation. *Kirkpatrick*, 827 F.2d at 726; *Griffin v. Carlin*, 755 F.2d 1516, 1532 (11th Cir.1985). "[A]dequate class representation generally does not require that the named plaintiffs demonstrate to any particular degree that they will individually pursue with vigor the legal claims of the class." *Kirkpatrick*, 827 F.2d at 727. The Defendants, quite properly, raise no question as to the qualifications, experience and ability of Plaintiffs' counsel. The fact that the proposed Class Representatives are allowing their counsel to prosecute the case demonstrates the exercise of good judgment and not abdication of their obligations as class representatives. *Miller Industries*, 186 F.R.D. at 687–88.

The approach taken by the Eleventh Circuit is well grounded in Supreme Court precedent. In *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966), the Supreme Court held that verification of a complaint in a stockholder derivative action was valid even though the plaintiff lacked personal knowledge of the claims asserted and did not fully comprehend the underlying financial transactions described in the complaint. In upholding the plaintiff's verification, notwithstanding her lack of knowledge about the case, the Supreme Court stated that "[r]ule 23(b), like the other civil rules, was written to further, not defeat the ends of justice. The serious fraud charged here is clearly in that class of deceitful conduct which the federal securities laws were largely passed to prohibit and protect against." *Surowitz*, 383 U.S. at 373–74, 86 S.Ct. 845. Although the Supreme Court's decision involved Rule 23(b), the Supreme Court's rationale is clearly applicable to Rule 23(a)(4). *See Wells v. HBO & Co.*, 1991 WL 131177, at *6, 1991 U.S. Dist. LEXIS 11312 at *12 (N.D.Ga.1991) ("[m]ost courts follow the rationale set forth in *Surowitz* in rejecting challenges to the adequacy of representa-

tion based on his or her ignorance of the facts or theories of liability").

■ There is nothing on the face of the Reform Act that requires and/or permits modification of the standard for adequacy under Rule 23(a)(4). Indeed, in *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir.2000), a post-Reform Act case, the Second Circuit expressly adopted the *Surowitz* standard with respect to Rule 23(a)(4) when the court granted class certification to plaintiff over defendant-appellee's objection that plaintiff was inadequate because he lacked knowledge of the case. *Baffa*, 222 F.3d at 61. The court stated that the Supreme Court in *Surowitz* "expressly disapproved of attacks on the adequacy of a class representative based in a representative's ignorance." *Id.* Moreover, the legislative history of the lead plaintiff provision expressly rejects the idea of any modification of Rule 23(a)(4) by the Reform Act. The Conference Report accompanying passage of the Reform Act states that "[t]he provisions [of the Reform Act] relating to the appointment of a lead plaintiff are not intended to affect current law with regard to challenges to the adequacy of the class representative or typicality of the claims among the class." H.R. Conf. Rep. No. 104–369, at 34 (1995).

Thus, the Defendants have failed to convince this Court that there is any reason for this Court to deviate from controlling Eleventh Circuit precedent to follow a conflicting case from the Fifth Circuit. The Plaintiffs have met their burden under Rule 23(a)(4) of showing that they will fairly and adequately protect the interests of the class. Because the Plaintiffs have established the four prerequisites of Rule 23(a), the Court now turns to whether the Plaintiffs can satisfy either Rule 23(b)(2) or Rule 23(b)(3).

### C. RULE 23(B)(3) ANALYSIS

■ Pursuant to Rule 23(b)(3), the Court considers (1) whether issues of law or fact common to members of the class predominate over questions affecting only individual members; and (2) whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3). "[I]n analyzing predominance and superiority, the Court must scrutinize the evidence the plaintiffs propose to use in proving their claims without unnecessarily reaching the merits of the underlying claims." *Domestic Air*, 137 F.R.D. at 684; *Miller Industries*, 186 F.R.D. at 688. On the question of predominance, Rule 23(b)(3) provides that the court must find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members. It is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions. *Cox*, 784 F.2d at 1557. Thus, issues in the class that are subject to generalized proof must predominate over those issues that are subject only to individualized proof. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir.1997).

■ In this case, the Plaintiffs have alleged a series of misrepresentations and omissions. The Plaintiffs claim that the alleged misrepresentations and omissions related, directly or indirectly, to the rate of expected earnings growth at Theragenics. The Plaintiffs claim that during the class period the price of Theragenics common stock was inflated because of these alleged misrepresentations and omissions, and that they purchased their shares at these inflated prices. The claims of each member of the class arise out of this same set of operative facts. The legal questions common to each member of the class are whether the alleged misrepresentations constitute federal securities fraud. The facts alleged by the Plaintiffs are sufficient to satisfy the requirement that common questions of law and fact predominate over individual questions. A finding to the contrary would be inconsistent with the overwhelming majority of the published decisions in this area.

■ To certify a class under Rule 23(b)(3), the Court must also find that the class action is superior to other available methods of adjudication. "In making its determination, the Court must find that difficulties in management will not render this action improper for certification." *Domestic Air*, 137 F.R.D. at 693. Certification cannot be denied because the number of potential class members makes the proceeding complex or difficult. *Id.* Difficulties in management of a case become significant "only if

they make the class action a less 'fair and efficient' method of adjudication than other available techniques." *Id.* (quoting *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278, 282 (S.D.N.Y.1971)). The Court finds that a class certification is superior to any other method of adjudication and is the only practical way to proceed. Accordingly, the Plaintiffs have satisfied the requirements of Rule 23(b)(3).

### III. CONCLUSION

For the reasons set forth above, the Plaintiffs' Motion for Class Certification [Doc. 41] is GRANTED.